In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1595

STEVEN D. LISLE, JR.,

*Plaintiff-Appellant,*

*v.*

WILLIAM WELBORN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:15-CV-00965 — **Michael J. Reagan**, *Judge.*

ARGUED MARCH 29, 2019 — DECIDED AUGUST 1, 2019

Before HAMILTON, BARRETT, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents issues stemming from a prison's discipline of a prisoner and his later suicide attempts. The story began in 2014 when correctional officers at the Menard Correctional Facility found contraband alcohol in the cell of plaintiff Steven D. Lisle, Jr. Lisle's cellmate at first took responsibility for the contraband but later recanted outside of Lisle's presence. He said instead that Lisle had been abusing him and had forced him to take the blame

for the alcohol. In disciplinary proceedings, Lisle later asked to call a witness to testify about his cellmate's initial admissions. His requests were ignored. Lisle, who is black, was sentenced to four months in disciplinary segregation. His cellmate, who was white, was not disciplined.

While in segregation, Lisle attempted to commit suicide three times. His third attempt was nearly successful, and he was placed on suicide watch in the prison infirmary. While there, Lisle claims, a nurse taunted him for his failed suicide attempts and encouraged him to try again. Lisle filed this suit alleging that he was punished based on his race, that he was deprived of liberty without due process of law, and that the prison staff's conduct in the wake of his mental health crisis—including the nurse's statements—amounted to cruel and unusual punishment.

The district court granted summary judgment on several claims but held a jury trial on Lisle's claims for deliberate indifference to a serious medical need. During jury selection, defense lawyers used peremptory strikes to remove three of the four black potential jurors. After the jury was selected, but before it was sworn and the venire released, Lisle's counsel objected pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), challenging the use of peremptory strikes against the black jurors. The judge denied the objection as untimely.

Lisle appeals the summary judgment decision and seeks a new trial based on his *Batson* claim. We agree that his *Batson* claim was timely, and we cannot find that the erroneous denial was harmless. We remand for an evidentiary hearing on the *Batson* claim and, if necessary, a new trial on all claims that were tried. We also reverse summary judgment for the nurse

on the taunting claim. We affirm all other aspects of the judgment.

I.  *Factual & Procedural Background*

A.  *Cell Search & Disciplinary Proceeding*

To the extent we review the partial grant of summary judgment, we review the facts in the light most favorable to Lisle as the non-moving party, giving him the benefit of conflicts in the evidence. *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). Steven D. Lisle, Jr. was an inmate at the Menard Correctional Center in Illinois, where he shared a cell with another inmate. On August 12, 2014, when Lisle was at the prison gym, correctional officers searched his cell and found contraband: a trash bag of liquid that contained 7% alcohol. Two correctional officers took Lisle to segregation to await a disciplinary hearing.

On the way to the segregation unit, he crossed paths with his cellmate, who had also been at the gym when the search occurred. Lisle asked his cellmate if he was going to "take his weight" (claim responsibility) for the contraband. The cellmate said yes and told Lisle that he had "already told them whatever they found" in the cell was his. Lieutenant Michael Samuel was within earshot of this conversation. Lisle told Lieutenant Samuel that he was going to call him as a witness at his disciplinary hearing. Samuel told Lisle he would testify.

Outside of Lisle's presence, though, his cellmate later recanted. He said he had claimed the alcohol was his only because Lisle had put him "through some serious hell." The cellmate revealed extensive bruising all over his body that he claimed was the result of Lisle's physical and sexual abuse. He expressed fear for his life. The cellmate was placed in

protective custody and a rape kit was used to test him. He was never placed in segregation, and the Adjustment Committee found him not guilty for the contraband. Lieutenant Brookman testified in this case that Lisle was not informed of the allegations his cellmate made because disclosing to an alleged abuser that his victim has reported the abuse is "what gets people hurt in prison."

Once Lisle was placed in segregation, a correctional officer provided him with a copy of the disciplinary report outlining the charged violations. Lisle asked for a pen so that he could sign the report and ask to have Lieutenant Samuel testify at the disciplinary hearing. The officer refused, so Lisle made an oral request that Samuel be called to testify. The next day, Lisle met with his counselor and again made an oral request to call Lieutenant Samuel as a witness. His counselor forwarded the request to Internal Affairs, which in turn faxed the request to the Adjustment Committee.

Two days after the search, the disciplinary hearing was held before the Adjustment Committee comprised of Lieutenant Kent Brookman and another official whom Lisle has not sued. Lieutenant Samuel did not attend the disciplinary hearing. Brookman indicated he had already spoken with Samuel and would do so again.[1]

The Adjustment Committee found Lisle guilty and sentenced him to four months of disciplinary segregation and four months of reduced privileges, such as commissary restrictions, and six months of contact visit restriction. Despite Lisle's request that Samuel testify at least three times, the

---

[1] It is not clear from the record whether Brookman actually spoke with Samuel or not. For purposes of summary judgment, we assume he did not.

Adjustment Committee's final report indicated that he had not requested a witness.

B. *Lisle's Mental Health Crisis*

While in segregation, Lisle attempted to commit suicide with a makeshift rope three times over the course of three days. He claimed that being denied the chance to present a witness at his hearing and the slow response to the post-hearing grievances he filed caused him to become depressed. He repeatedly asked for a mental health and crisis team but did not receive intervening assistance before his third suicide attempt.

Lisle described his segregation cell as being poorly ventilated, with rusty bars and with corroded feces in the toilet. He was not given a brush to clean the toilet, and he had access to fewer cleaning supplies due to his loss of commissary privileges. He also had fewer privileges than when he was in general population, such as loss of access to the gym and fewer opportunities to go outside or shower. He had a cellmate throughout his entire stay in "segregation."

Lisle described his first two suicide attempts in a deposition taken April 25, 2017. He said his first suicide attempt on September 3, 2014 failed when the makeshift rope he tied around his neck snapped under his weight. Lisle alleges Lieutenant Welborn and Nurse Reeves witnessed the attempt. Lisle claims he informed them he was attempting to kill himself and handed Reeves a suicide note. According to Lisle, they both walked away without a word.

The next day, Lisle again attempted suicide unsuccessfully, this time, he says, in the presence of correctional officer Christopher McClure and another nurse, Jodi Hormann. Lisle

again claims he handed the nurse a suicide note and told them both that he intended to kill himself. In a repeat of the day before, Lisle says, the two prison staff members simply walked away. Before Lisle attempted suicide a third time, he gave another officer, Cale Young, a third suicide note and informed the officer that he was going to attempt suicide again. According to Lisle, Young put the note in his pocket and walked away.

The night of September 5, 2014, Lisle attempted to commit suicide a third time while his cellmate was asleep. This time, a correctional officer and a medical staff member saw him hanging in his cell and yelled for his cellmate to help. His cellmate helped the officers support Lisle by his legs to give the officers time to remove the rope from his neck. Lisle was taken to the infirmary, where the medical staff noted he had injuries on his neck that appeared several days old, consistent with prior suicide attempts. He remained in the infirmary and was placed on suicide watch.

On the instructions of the medical director, Lisle was placed on "strip cell suicide watch," which meant he was not provided a mattress and could use only a suicide-resistant blanket. He was also checked every ten minutes, with vital signs checked every two hours. Jana South was a nurse working in the infirmary when Lisle was admitted. Lisle testified that when Nurse South evaluated him a few hours later, she repeatedly mocked him for failing to kill himself. She lamented that Lisle had not succeeded in his suicide attempts, told him he should have done it "properly," and said he should "do a better job next time." Later, Lisle also complained that his back hurt from sleeping on the steel slab without a mattress and requested a blanket because his cell was

too cold. South taunted him, saying that if he wanted a mattress, he should not be on suicide watch and that he should not care about being cold or uncomfortable since he was trying to kill himself. South denied making any of these statements.

Despite the dispute about what Nurse South said, it is undisputed that she continued to provide care to Lisle. She evaluated him several times, took his vital signs, and conducted at least one neurological examination. After her first evaluation of Lisle, South also called a mental health physician to evaluate Lisle, which occurred the next morning. Lisle remained in the infirmary for six days.

C. *Partial Summary Judgment and Trial*

Lisle sued under 42 U.S.C. § 1983, bringing five counts against fourteen prison staff members. First, he claimed Lieutenant Brookman, as chair of the Adjustment Committee, deprived him of a protected liberty interest without due process of law when he failed to call Lieutenant Samuel to testify. Lisle also alleged that Lieutenants Samuel and Brookman and the second officer who brought Lisle to segregation discriminated against him based on his race. Count III alleged an Eighth Amendment claim against Reeves, Welborn, Hormann, McClure, Young, and South, for their failure to obtain medical help for Lisle when he was suicidal, and for Nurse South's verbal abuse of Lisle when he was on suicide watch. He also sued Nurse South based on his experiences in the infirmary and her alleged refusal to call a doctor when he requested one. Finally, he alleged that several prison officials violated his constitutional rights in their handling of multiple grievances he had filed.

The defendants moved for summary judgment. The district court granted the motion in part on the due process claim because Lisle failed to show that confinement in segregation deprived him of a protected liberty interest. The district court also granted summary judgment for the equal protection defendants, finding no evidence of racial motive in any defendant's actions.

The district court dismissed the deliberate indifference claim against Nurse South for her conduct in the infirmary. The district court reasoned that under *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000), the alleged taunting would be "reprehensible," but would amount only to "simple verbal harassment," which would not amount to cruel and unusual punishment. The court explained: "though South may have made statements suggesting Plaintiff kill himself, she nonetheless did her job and treated Plaintiff. Defendant South therefore did not *exhibit* deliberate indifference to Plaintiff's risk of suicide." The court denied summary judgment on the claims of deliberate indifference against the prison staff members for their alleged failure to act when Lisle was suicidal.

The court granted summary judgment dismissing most of Lisle's conditions-of-confinement claims, but the court denied summary judgment on his claim that Nurse South refused to call a doctor. Finally, the court dismissed the claims against various prison officials for their failure to act on the grievances he submitted because Lisle failed to provide sufficient evidence to support these claims.

The surviving claims were tried to a jury. During voir dire, only four African-American veniremen were called. The two teams of defense counsel used three of their six peremptory strikes against black panel members. Just after the jurors were

selected, but before they were sworn and the venire released, Lisle's attorney objected pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), that those three strikes were racially motivated. The district court denied Lisle's objection as untimely. The court told Lisle he "should have made [the objections] while we were doing it. I think you waived at this juncture. We can make a record. I know we do have an African American on the jury."

The court then addressed defense counsel, explaining that if they wanted "to make a response... I am happy to listen to race neutral responses.... It is probably a good opportunity for you to respond if you have a race neutral response you want to give or you don't have to respond at all." Counsel for the medical defendants briefly explained that they struck two black jurors who had close family members who had been incarcerated. Counsel doubted those jurors' abilities to be fair to the defendants in this case, despite the jurors' assertions that the family members' experiences would not affect their decision. The judge said that the reasons proffered were race neutral, but he did not make any express finding that he believed the offered reasons were honest.

After a three-day trial, a jury found for Lisle on the claim that Reeves, Welborn, Hormann, and McClure were deliberately indifferent to his suicide attempts, but the jury awarded him only $300 in compensatory damages. The jury found in favor of Nurse South on the claim that she denied Lisle a physician. The jury also found for Young on the claim of deliberate indifference to Lisle's suicide attempt and for Hill on the claim that she was deliberately indifferent to a serious risk of harm to Lisle by ignoring his grievances.

On appeal, Lisle argues that his *Batson* challenge was timely and that summary judgment for the defendants was improper on some claims: whether South's comments violated the Eighth Amendment, whether Lieutenants Brookman and Samuel violated the Equal Protection Clause, and whether Brookman deprived him of liberty without due process when he refused to call Samuel as a witness.

II.  *Analysis*

We begin with the district court's ruling on the *Batson* challenge before analyzing its decisions to grant summary judgment on the Eighth Amendment, equal protection, and due process claims.

A.  *Batson Challenge*

In *Batson v. Kentucky*, the Supreme Court held that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." 476 U.S. 79, 85 (1986). *Batson* has been extended to civil cases, so peremptory strikes simply may not be used on account of race. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) ("The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"), quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991) (*Batson* applies to civil cases).

A *Batson* claim is analyzed in a three-step process in the trial court. First, if a party suspects peremptory strikes are being used for discriminatory reasons, he must object and make a prima facie case of racial discrimination. "[T]he burden at the *prima facie* stage is low, requiring only circumstances raising a suspicion that discrimination occurred, even where

those circumstances are insufficient to indicate that it is more likely than not that the challenges were used to discriminate." *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005). Second, if the court finds the party has made a prima facie showing of discrimination, the burden shifts to the striking party to provide a race-neutral reason for the strike. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). Third, the trial judge must then "determine whether the ... stated reasons were the actual reasons or instead were a pretext for discrimination." *Id.*

The district court rejected Lisle's *Batson* challenge as untimely. Trial judges have considerable flexibility and discretion in managing jury selection, including how they provide a reasonable opportunity to raise *Batson* challenges. A reasonable opportunity to raise a *Batson* challenge is essential. This *Batson* challenge was not untimely. We have said that "[c]ontemporaneous objection is imperative with respect to *Batson* claims," *United States v. Chandler*, 12 F.3d 1427, 1431 (7th Cir. 1994), but contemporaneous does not mean instantaneous. Rather, "the dismissal of the venire or the swearing of the jury is the presumptive deadline for making *Batson* challenges." *United States v. Williams*, 819 F.3d 1026, 1029 (7th Cir. 2016).

Lisle's *Batson* challenge was timely. He objected within minutes after the third of four black potential jurors was struck. He objected before the jury was sworn and before the dismissal of the venire. While *Batson* objections should be raised as early as practicable, the purpose of these challenges and our case law show that an objection to a discriminatory strike need not occur immediately after a particular strike is made. After all, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Flowers*, 139 S. Ct. at 2246, quoting *Batson*,

476 U.S. at 97. The objecting party might not even be aware of a violation until several strikes have been made, or even until all peremptory strikes have been exercised by all parties. The trial judge erred in deeming Lisle's *Batson* challenge untimely.

We also cannot deem harmless here the erroneous denial of the *Batson* challenge as untimely. First, a racially motivated strike of a single juror is forbidden and requires a new trial. *Foster*, 136 S. Ct. at 1747, quoting *Snyder*, 552 U.S. at 478. In addition, the trial judge's sensible effort to "make a record" at the time fell one critical step short. The judge invited defense counsel to state for the record race-neutral reasons for their strikes of the black jurors. They did so, and the judge said they were indeed race-neutral reasons. The problem is that the judge never took the final step of making a finding on the spot about the credibility of those reasons. See, e.g., *Snyder*, 552 U.S. at 479 (reversing denial of *Batson* challenge where trial judge had never made finding on juror's demeanor or credibility of proffered race-neutral reason for strike). And unfortunately, counsel did not ask the judge for that one further finding. While we can glean some information from this record, we have no way to know whether the attorneys were credible. For example, the record does not show whether similarly situated white jurors were struck for similar reasons, nor did the judge say anything about anyone's demeanor.[2]

Because the district court did not make a credibility finding here, we must remand for further findings and,

---

[2] We asked at oral argument whether any peremptory strikes were used on white jurors for similar reasons. Counsel for defendants responded that Juror 9 was white and was also struck because he had a close family member who had been incarcerated. The district court, however, noted on the record that Juror 9 was black. Supp. App. 340.

depending on the findings, a new trial. *Morgan v. City of Chicago*, 822 F.3d 317, 331 (7th Cir. 2016); *United States v. Rutledge*, 648 F.3d 555, 560 (7th Cir. 2011) ("when we confront an evidentiary gap at step three, the ultimate *Batson* issue cannot be resolved without a remand"). If the district court cannot make the necessary findings (perhaps because of delay or the veteran trial judge's retirement), or if the court ultimately finds that the stated reasons were not credible, then the case must be retried. See *Rutledge*, 648 F.3d at 562 (conviction must be vacated "if the passage of time precludes the district court from making such findings, or if it finds that the prosecutor's reasons are not credible"); *United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) (remand for findings rather than retrying the case was appropriate remedy in light of court's failure to make findings on race-neutral reasons when only a year had passed); see also *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 489 (9th Cir. 2014) (remanding for a new trial after *Batson* violation in civil case).

B. *Cruel and Unusual Punishment Claim Against Nurse South*

The district court granted summary judgment for Nurse South on the ground that simple verbal harassment cannot constitute cruel and unusual punishment. For purposes of summary judgment, we must assume South did make the statements as Lisle claimed, encouraging Lisle to kill himself while he was on suicide watch under her care.

Summary judgment is appropriate only when the movant shows there is no genuine dispute as to any material facts and is entitled to judgment as a matter of law. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018); Fed. R. Civ. P. 56(a). We review *de novo* the district court's grant of summary judgment, considering the facts in a light favorable to Lisle and drawing

all reasonable inferences in his favor. *Horton*, 883 F.3d at 948. At this stage, we may not assess the credibility of the witnesses or balance the weight of conflicting evidence. *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019) (reversing summary judgment).

The Eighth Amendment prohibits cruel and unusual punishments that involve the unnecessary and wanton infliction of pain. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The prohibition also includes acts "totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002), quoting *Rhodes*, 452 U.S. at 346. This prohibition reaches wanton infliction of pain and deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

Lisle's claim against Nurse South lies at the intersection of deliberate and pointless infliction of psychological injury and deliberate indifference in medical care. In ordinary medical care cases under the Eighth Amendment, "we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties*, 836 F.3d at 727–28, citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In applying this test, "we look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728–29.

At the first step, the risk of suicide is an objectively serious medical condition, and it is well established that inmates have the right to be free from deliberate indifference to this risk while in custody. See *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017) (inmate's "right to be free from deliberate

indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012"); *Woodward v. Correctional Medical Servs. of Illinois, Inc.*, 368 F.3d 917, 926–27, 929 (7th Cir. 2004) (jail managers would be guilty of deliberate indifference if they took no precautions against the possibility of an inmate's suicide); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003) ("no doubt" the right of an inmate to be free from deliberate indifference to his risk of suicide was clearly established in 1998); *Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk.").

At the second step, "[w]here the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). This requires "more than mere or gross negligence, but less than purposeful infliction of harm." *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

Proving actual subjective knowledge of the risk is often difficult, see *Petties*, 836 F.3d at 728, but not here. Nurse South was responsible for monitoring and evaluating Lisle while he was on suicide watch. Lisle met his burden on this half of the subjective prong.[3]

---

[3] South argues that Lisle was never in any real danger because he was on suicide watch. The argument is both speculative and irrelevant to the claim that her statements were intended to cause him psychological pain.

Lisle also offered evidence to support the second compo-
nent of this prong—that South intentionally disregarded the
risk of suicide. He need not offer evidence of purposeful in-
fliction of harm. Here, Lisle alleges that South was deliber-
ately indifferent to his risk of suicide by taunting him for be-
ing unsuccessful and actually encouraging Lisle to kill him-
self while he was in the infirmary on suicide watch. Assuming
Lisle's account is true, as we must, South's statements could
be deemed cruel infliction of mental pain and deliberate in-
difference to his risk of suicide, making summary judgment
improper.

The district court granted summary judgment, quoting
our statement that, "Standing alone, simple verbal harass-
ment does not constitute cruel and unusual punishment, de-
prive a prisoner of a protected liberty interest or deny a pris-
oner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d

---

That alleged pain did not depend on Lisle's ability to follow through on
his suicidal intent. See *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)
(reversing dismissal; prisoner's receipt of some medical care does not au-
tomatically defeat claim of deliberate indifference; fact-finder could infer
intentional mistreatment was likely to seriously aggravate a medical con-
dition); see also *Jordan v. Gardner*, 986 F.2d 1521, 1526 (9th Cir. 1993) (find-
ing deliberate indifference to female inmate's psychological vulnerabili-
ties when cross-gender searches exacerbated symptoms of "pre-existing
mental conditions"). Also, unfortunately, there is no guarantee an inmate
is safe from the risk of suicide while on suicide watch. Suicide-prevention
measures reduce opportunities to commit suicide, but according to a 2010
study conducted by the National Institute of Corrections, about 7.5% of
inmates who committed suicide in 2005 and 2006 were on suicide watch.
National Institute of Corrections, U.S. Department of Justice, *National
Study of Jail Suicide 20 Years Later*, https://info.nicic.gov/nicrp/sys-
tem/files/024308.pdf at page 27, April 2010.

607, 612 (7th Cir. 2000) (officer allegedly used racially and sex-
ually derogatory language). Since *DeWalt*, however, we have
said that its language was too broad, explaining: "The propo-
sition that verbal harassment cannot amount to cruel and un-
usual punishment is incorrect." *Beal v. Foster*, 803 F.3d 356, 357
(7th Cir. 2015).

Our analysis in *Hughes* and *Beal* confirms that the "simple
verbal harassment" language of *DeWalt* would not preclude a
reasonable jury from finding deliberate indifference here. In
*Hughes v. Scott*, 816 F.3d 955 (7th Cir. 2016), we reversed dis-
missal of an inmate's claim where he had been committed in-
voluntarily to a facility for individuals suffering from mental
disorders. The plaintiff alleged that the staff called him "igno-
rant," "stupid," and a "moron." *Id.* at 957. They also told him
his life would go better if he stopped filing grievances about
his treatment at the facility. We distinguished *DeWalt* and de-
termined that the alleged statements to Hughes went beyond
simple verbal harassment because of his vulnerability: "Just
as police when interrogating children are held to understand
the mental and psychological differences between adults and
children...so staff of an institution that houses and treats per-
sons suffering from mental disorders should be held to un-
derstand that they are dealing with psychologically impaired
persons." *Id.* at 957 (internal citation omitted).

In *Beal v. Foster*, a male inmate brought an Eighth Amend-
ment claim against a male officer who he claimed made sexual
innuendos about him in front of other inmates. 803 F.3d at
358. The district court dismissed on the theory that the state-
ments were simple verbal harassment. We reversed. The
guard's statements and behavior could have been understood
by other inmates as implying Beal was homosexual. Beal

feared an increased risk of sexual assaults by other inmates, and could have inflicted "significant psychological harm on him" in violation of the Eighth Amendment. *Id.* at 359.

In support of this conclusion, *Beal* used hypotheticals to show that verbal harassment can rise to a level that violates the Eighth Amendment. For instance, it would be cruel and unusual for a correctional officer to tell an inmate with a severe headache that the doctor had told the officer the inmate actually had terminal brain cancer. *Id.* at 357. Or suppose a guard tells an inmate falsely that his family has been killed in a car crash. *Id.* These classic examples would violate the Eighth Amendment despite the lack of physical abuse. In other words, "the alleged pain [sufficient to constitute cruel punishment] may be physical *or psychological.*" *Id.* at 357–58, quoting *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); see also *Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc) (affirming permanent injunction against cross-gender searches of female inmates; prison officials acted with deliberate indifference to harm that cross-gender clothed body searches were likely to cause female inmates who had been victims of sexual abuse).

With the understanding that the Eighth Amendment also protects psychologically vulnerable inmates against psychological pain deliberately inflicted by correctional officers, Nurse South's alleged statements, if made, went beyond "simple verbal harassment." She is alleged to have taunted and encouraged an inmate known to be suicidal and in the midst of a mental health crisis to take his own life. As his nurse on suicide watch, she was uniquely situated to aggravate Lisle's condition by using her specialized knowledge to target his psychological vulnerabilities, causing him

psychological pain. Nurse South denies making these statements, as noted, but the factual disagreement simply underscores the issues of material fact to be decided at trial.

We are not persuaded by Nurse South's attempts to distinguish *Beal* and *Hughes*. She points out that *Beal* involved sexual harassment and fear of sexual attacks. Thus it was not "simple verbal harassment" because it involved the danger of exposing the inmate to sexual assault. We do not see a constitutionally relevant line between vulnerability to sexual attacks and vulnerability to suicide. In both situations, prison staff would be exploiting a known vulnerability to create a danger or harm that cannot have any legitimate penological purpose.

South also points out that *Hughes* and *Beal* reversed dismissals on the pleadings rather than after summary judgment. Such differences in procedural posture can be important, but not for this question of law. See also *Olson v. Bloomberg*, 339 F.3d 730, 737–38 (8th Cir. 2003) (affirming denial of summary judgment; reasonable jury could infer deliberate indifference to risk of suicide where correctional officer said, "you do what you got to do," when inmate said he would hang himself).

Finally, Nurse South points to the medical care she provided to help Lisle while he was on suicide watch as evidence that she was not deliberately indifferent to his risk of suicide. For instance, she checked his vital signs regularly, performed neurological examinations, and requested an examination by a mental health physician. This evidence may well be powerful at trial, but it is not conclusive as a matter of law on a motion for summary judgment. Evidence of "*some* medical care does not automatically defeat a claim of deliberate

indifference if a fact finder could infer the treatment was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Encouraging a suicidal inmate to kill himself, if that in fact happened, would fit this description.

We intend this holding to be narrow. Repugnant words, like those alleged in *DeWalt*, will seldom rise to an Eighth Amendment violation. As we acknowledged in *Beal*, "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." 803 F.3d at 358. Relationships between prisoners and prison staff are not always marked by genteel language and good manners. The Eighth Amendment nevertheless can apply to an extreme case where medical staff use an inmate's known psychological vulnerability to cause psychological anguish.

On remand the district court may need to consider what impact, if any, 42 U.S.C. § 1997e(e) may have on these claims. Section 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." We have read this provision to apply only to compensatory damages, not nominal or punitive damages involving no physical injury. *Calhoun v. De-Tella*, 319 F.3d 936, 941 (7th Cir. 2003). We are not alone in interpreting § 1997e(e) this way. See *Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002) (punitive damages for Eighth Amendment violations not barred); *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002) (punitive damages for constitutional violation

not barred); *Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) ("§ 1997e(e) does not bar claims seeking nominal damages to vindicate constitutional rights, nor claims seeking punitive damages to deter or punish egregious violations of constitutional rights"); *Searles v. Van Bebber*, 251 F.3d 869, 881 (10th Cir. 2001) ("salient fact is that Congress simply did not choose to provide a restriction on punitive damages").

C. *Equal Protection*

Lisle next claims Lieutenants Samuel and Brookman violated his Fourteenth Amendment rights by placing him in segregation but not his white cellmate. "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Protection from disparate treatment based upon race does not vanish merely because a person is incarcerated. *Id.* at 555.

To avoid summary judgment on this claim, Lisle needed to come forward with evidence that would allow a reasonable jury to infer that the defendants intentionally treated him differently because of his race. In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), our opinion explained that courts deciding whether a defendant acted with a discriminatory motive (in *Ortiz*, an employment decision) should avoid getting entangled by formal methods and distinctions between direct and circumstantial evidence. Instead, we explained, the standard is whether all the evidence "would permit a reasonable factfinder to conclude that plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. at 765. The same reasoning and standard apply to a claim of intentional and unconstitutional race discrimination by prison officials.

If the disciplinary decisions by Lieutenant Brookman (perhaps aided by Lieutenant Samuel) were motivated by race, that would violate the Equal Protection Clause. *Brown v. Budz*, 398 F.3d 904, 916–17 (7th Cir. 2005); see also *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984) ("A policy of deliberate racial segregation of prisoners would raise serious questions under the equal protection clause of the Fourteenth Amendment."); *Williams v. Lane*, 851 F.2d 867, 881–82 (7th Cir. 1988) (unequal treatment of inmates without rational relation to legitimate penal interest violates Equal Protection).

Lisle, however, has not presented evidence that would allow a jury to infer reasonably that Lieutenants Samuel or Brookman acted based on racial animus. Starting first with Samuel, nothing in the record could lead a reasonable jury to determine that he even had the authority to decide that Lisle would be placed in disciplinary segregation and his cellmate would not. The disciplinary charges for Lisle and his cellmate were both signed by an officer who is not a party in this action. Samuel's only involvement in Lisle's segregation was that he escorted him there pending his disciplinary hearing.

Lieutenant Brookman served as one of two members of the Adjustment Committee that oversaw Lisle's disciplinary hearing. Lisle claims Brookman denied him the right to call a witness during the disciplinary hearing because Lisle is black. Lisle introduced no evidence, though, suggesting that Brookman's failure to call Samuel was based on race or that Brookman permitted similarly situated white inmates to call witnesses while not allowing black inmates to do so. Undisputed evidence instead indicates the decision was based on the alleged threats and abuse that the correctional officers apparently found credible. In this instance, correctional officers

believed the white inmate, not the black inmate. Without more evidence of racial motive, the officers' judgments about whom to believe are not sufficient to allow a jury to infer racial bias. Lisle's claim of race discrimination is supported only by speculation and conjecture, which is not enough to survive summary judgment. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 466 (7th Cir. 2016). We affirm the district court's grant of summary judgment on Lisle's equal protection claims.

D.  *Deprivation of Liberty Without Due Process*

Finally, the district court correctly granted summary judgment on the due process claim against Lieutenant Brookman. When an inmate raises a due process claim for a disciplinary proceeding, he must demonstrate: (1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). Lisle fails at the first step, so we do not address whether the procedures were constitutionally deficient.

Lisle's claimed liberty interest was avoiding assignment to a segregation cell. Avoiding segregation can constitute a protected liberty interest, but the facts matter. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013), citing *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009). This interest is triggered only when the confinement imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). When considering whether disciplinary segregation imposes atypical and significant hardships, we look to both the duration of the segregation and the conditions endured. *Marion*, 559 F.3d at 697.

First, the duration of segregation was not an atypical or significant hardship. We have found that, depending on the conditions of confinement and whether there were any additional punishments, a period of segregation considerably shorter than four months may satisfy this requirement. *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) (collecting cases). However, we have also found longer durations did not. *Marion*, 559 F.3d at 698 (six months of segregation is not such an extreme term as to trigger due process rights without more). A sentence of four months in segregation for the discovery of contraband is not so atypical and significantly harsh that it creates a liberty interest.

Second, Lisle has not shown that the conditions of his confinement in segregation themselves imposed atypical and significant hardships. Lisle needed to show that the conditions of his confinement in his segregated cell deviated substantially from the ordinary conditions of prison life. *Sandin*, 515 U.S. at 486 (inmates must demonstrate that punishment constituted dramatic departure from basic conditions of prison life to present atypical and significant hardship such that it would create liberty interest); *Kervin*, 787 F.3d at 836 ("the critical question is how far the treatment of the complaining inmate deviates from [the] ordinary conditions" of a high-security prison and the conditions under which prisoner is actually held). In short, if the disciplinary measures do not "substantially worsen the conditions of confinement" of an inmate, then he has not been deprived of a protected liberty interest. *Miller v. Dobier*, 634 F.3d 412, 414–15 (7th Cir. 2011).

We agree with the district court that Lisle did not offer evidence that would allow a reasonable jury to find the conditions of his segregation imposed atypical and significant

hardships. The vague description of his cell, including rust on the bars and "corroded feces" in the toilet, does not itself reveal much. Regardless, a jury could not reasonably infer that these conditions were unique to cells in the segregation unit or that these conditions caused Lisle any significant hardship. Lisle is correct that we do not find conditions are typical and acceptable merely because they do not rise to the most extreme conditions, but he needed to offer some evidence that would allow a jury to determine that the conditions in segregation deviated substantially from ordinary conditions of his confinement.

Lisle further argues that placing an inmate in a cell that exacerbates his depression and suicidal urges without providing a crisis team implicates his liberty interest. We need not decide whether this is correct because the record does not reflect Lisle's mental health crisis was exacerbated by the conditions of his confinement. Instead, the record shows Lisle attributes his frustration with the disciplinary hearing and the grievance process as the trigger for his worsening mental health.

*   *   *

To sum up, we REVERSE summary judgment for Nurse South on the Eighth Amendment claim based on her alleged taunts. On the *Batson* claim, we VACATE the portions of the judgment based on the trial verdict and REMAND for additional findings on the credibility of the defendants' race-neutral explanations for their peremptory strikes of black prospective jurors, and for such further proceedings as are needed consistent with this opinion, which may include a

new trial on the claims that were tried. In all other respects the judgment of the district court is AFFIRMED.[4]

---

[4] Lisle's deliberate indifference claim against the remaining defendants for allegedly failing to address his grievances was not briefed on appeal and thus waived. *United States v. Webster*, 775 F.3d 897, 904 (7th Cir. 2015) (arguments not raised in party's opening brief are waived); see also *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (mere mishandling of prisoner's grievance does not support claim).