In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1086

JORDAN WHITAKER,

*Plaintiff-Appellant,*

*v.*

MICHAEL DEMPSEY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:18-cv-50373 — **Philip G. Reinhard**, *Judge.*

ARGUED JANUARY 17, 2025 — DECIDED JULY 16, 2025

Before SYKES, *Chief Judge*, and HAMILTON and PRYOR, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Jordan Whitaker is a prisoner at Dixon Correctional Center with a long history of mental illness and self-harm. This case involves two incidents in August 2018 when Whitaker injured himself by reopening wounds on the inside of his elbow. He claims that Officer Michael Dempsey and Officer Michael Castenado violated his Eighth Amendment rights by acting with deliberate

indifference to the risk that he would injure himself. He also alleges that a single burst of pepper spray delivered by Lieutenant Brandt Boel constituted cruel and unusual punishment. In the district court, the defendants moved for summary judgment, arguing that no reasonable jury could find that Officer Dempsey or Lieutenant Boel violated Whitaker's Eighth Amendment rights or that Officer Castenado caused Whitaker to suffer a compensable injury.

To oppose defendants' motion for summary judgment, Whitaker relied exclusively on his deposition testimony, which contradicts itself and his own prior statements, and which diverges substantially from Officer Dempsey's and Lieutenant Boel's affidavits. After acknowledging that "he said, he said" disputes are ordinarily reserved for the fact-finder at trial, the district court granted summary judgment to the defendants on all counts. The court explained that this was the "rare" case where the "plaintiff's version of what happened is so flawed and so self-contradictory" that summary judgment is appropriate. *Whitaker v. Dempsey*, No. 18 C 50373, 2022 WL 20758240, at *5 (N.D. Ill. Dec. 12, 2022). The court also held that Whitaker had not suffered a cognizable injury at the hands of Officer Castenado. We affirm.

Parties and witnesses often contradict themselves or testify ambiguously. In the vast majority of such cases, the contradictions and other reasons to question credibility do not justify depriving "the trier of fact of the traditional opportunity to determine which point in time and with which words the witness … was stating the truth." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996), quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953–54 (11th Cir. 1986). In rare cases, however, and we agree with

the district court that this is such a case, internal contradictions on critical facts can become so extreme that a party's position may be deemed incredible beyond reasonable dispute. E.g., *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).

I.   *Factual and Procedural Background*

During his incarceration at Dixon Correctional Center, Jordan Whitaker has been diagnosed with multiple mental illnesses, including antisocial personality disorder, bipolar disorder, and post-traumatic stress disorder. At all times relevant to this case, Whitaker was housed in the crisis watch area at Dixon. Prisoners on crisis watch were clothed in smocks and deprived of sharp objects that they could use to injure themselves. Prison policy required correctional officers who learned that a prisoner was at risk of injuring himself to notify a superior officer. Prison policy also prohibited correctional officers from opening the cell door of a prisoner on crisis watch without a supervisor present, regardless of what they observed the prisoner to be doing.

Whitaker's claims involve two incidents, one on August 9, 2018 and one a week later, on August 16, 2018. On August 2nd, one week before the first disputed incident, Whitaker received medical treatment for cutting himself on the inside of his right elbow. Because he refused to cooperate with prison medical staff, he had to be taken to a hospital emergency room to have the laceration sutured. The next day, Whitaker was placed on a "crisis watch," with officers checking on him every ten minutes. On August 8th, his crisis-watch interval was changed to every fifteen minutes. The first incident giving rise to Whitaker's deliberate indifference claim against Officer Dempsey and his wanton and unnecessary force claim against Lieutenant Boel occurred the next day.

A.  *The August 9th Incident*

On August 9th, Officer Dempsey worked the evening shift in the crisis watch wing. Dempsey approached Whitaker's cell around 9:00 p.m. The parties disagree about what happened next.

According to Whitaker's deposition, he asked to speak with a crisis counselor, but Dempsey refused his request using coarse language. He claims he then showed Dempsey a sharp metal object, between two and a half and three inches in length, and told Dempsey that he was going to cut his arm. Dempsey responded that he "did not care," after which Whitaker began cutting the inside of his right elbow with the sharp object. Whitaker testified that Dempsey stood in front of his cell watching him cut himself for about five minutes before calling Lieutenant Boel, the supervisor on duty, for help.

Dempsey's affidavit lays out a different chain of events. He said that he observed Whitaker "on the floor of his cell with blood in his immediate area" and believed him to be injuring himself. Dempsey denied that Whitaker requested to speak with a crisis counselor or that he held up a sharp object. His affidavit further asserted that he directed Whitaker to stop injuring himself, but Whitaker did not respond or comply with that order. Dempsey then called Boel for assistance. Pursuant to prison protocol, he waited for Boel to arrive before entering Whitaker's cell.

When Boel and other correctional officers arrived at the cell, Whitaker was lying on the floor with a wound on his arm. There was blood on the walls and floor of the cell. After Whitaker did not respond to commands to move to the cuffing port, the officers entered the cell and placed him in handcuffs

with his hands in front, pursuant to prison policy. The officers then waited for nursing staff to arrive. Here, again, Whitaker's testimony diverged from the affidavits of the correctional officers.

Boel's affidavit asserted that Whitaker became "responsive and combative" when nursing staff arrived and that he refused to let them treat him. He began "waving his arm around," which prevented nursing staff from dressing his wound and resulted in his blood landing on surrounding staff members. Boel ordered Whitaker to stop flailing his arm around so that nursing staff could treat him and to prevent more blood from landing on staff members. Boel says he then warned Whitaker that he would use pepper spray if Whitaker failed to comply with his orders to stop moving. Because Whitaker continued to move his arm and fling blood on staff members, Boel delivered a single burst of pepper spray at Whitaker's face, after which Whitaker calmed down and became compliant.

Whitaker admits that blood was spilled on correctional staff, including Boel, but he denies that he ever flailed his arm or intended to get blood on staff members. He further denies that he ever became uncooperative, refused medical treatment, or pulled away from medical personnel. He also denies that Boel ordered him to stop moving or warned him about the pepper spray burst.

Although the parties dispute when Whitaker became compliant, all agree that a nurse was eventually able to treat his wound. After his wound had been dressed and approximately thirty minutes after being pepper-sprayed, Whitaker was taken to an eye-wash station. Because the nurses were

unable to stop the bleeding on Whitaker's arm, he was taken to the hospital, where he received sutures.

Whitaker also testified in his deposition that at some point before he was removed from his cell, he managed to hide the metal object that he had used to cut himself in a vent in the wall. Following the incident, prison staff searched plaintiff's cell for sharp objects and found none.

B. *The August 16th Incident*

The second incident occurred on August 16th, a week after the first. Whitaker testified that he showed the same sharp object that he had used to injure himself on August 9th to Officer Castenado, the officer on duty on the 16th. He then asked to speak to "psych." He testified that Castenado responded that he did not care and stood there while Whitaker cut his right arm. He further testified that Castenado waited seven minutes before calling his supervisor. After Castenado's supervisor arrived, prison staff opened Whitaker's cell and placed him in handcuffs, and a nurse attended to his cut. Later that day, around 7:30 p.m., a nurse cleaned the cut and noted no active bleeding at that time. Whitaker did not allow her to dress the wound.

C. *Procedural Background*

Whitaker filed this suit pro se against Officer Dempsey, Officer Castenado, and Lieutenant Boel. After the district court recruited counsel for him, Whitaker filed an amended complaint alleging three Eighth Amendment violations. He claimed that Officers Dempsey and Castenado had been deliberately indifferent to the serious risk that he would injure himself and that Lieutenant Boel's use of pepper spray constituted unnecessary and wanton force.

After discovery, the district court granted the defendants' motion for summary judgment. The court concluded first that Whitaker failed to offer evidence that he suffered a cognizable injury on August 16th. The court then concluded that no reasonable jury could find that Dempsey or Boel violated Whitaker's Eighth Amendment rights on August 9th.

II. *Analysis*

We review de novo the district court's grant of summary judgment for the defendants, interpreting all facts and drawing all reasonable inferences in favor of Whitaker, the nonmoving party. *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). We must emphasize here that Whitaker is entitled only to *reasonable* inferences in his favor. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence in support of the plaintiff's position" will not suffice. *Id.* at 252.

A. *Deliberate Indifference Claim Against Dempsey*

Whitaker claims that Dempsey was deliberately indifferent to the serious risk that he would harm himself on August 9th. Prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishment when they act or fail to act with "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim of deliberate indifference to a serious medical need, a plaintiff must show that (1) he faced a substantial risk

of harm due to an objectively serious medical condition and that (2) a prison official knew of and disregarded the risk. *Palmer v. Franz*, 928 F.3d 560, 563–64 (7th Cir. 2019). A genuine risk of suicide or self-harm constitutes an objectively serious medical condition. *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (suicide); *Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (self-harm).

Whitaker's deposition testimony regarding the August 9th incident conflicts with Officer Dempsey's affidavit and creates two disputed issues of fact material to Whitaker's deliberate indifference claim against Dempsey. First, the parties dispute whether Dempsey saw Whitaker hold up a sharp metal object and threaten to injure himself before cutting his arm. They also dispute whether Dempsey waited five minutes after seeing Whitaker begin to cut himself with the sharp object before calling Lieutenant Boel. If a jury resolved both factual disputes in Whitaker's favor, it could find that Dempsey was aware that Whitaker faced a serious risk of self-harm and that he was deliberately indifferent to that risk. See *Lewis v. McLean*, 864 F.3d 556, 563–64 (7th Cir. 2017) (a brief delay in treatment that exacerbates a prisoner's injury or unnecessarily prolongs his pain may constitute deliberate indifference); cf. *Estate of Perry v. Wenzel*, 872 F.3d 439, 458 (7th Cir. 2017) (jury could find that nurse acted objectively unreasonably by waiting three minutes after concluding that bleeding detainee was "medically unfit to be booked" before calling an ambulance).

At first glance, the factual issues about the sharp object and the five-minute delay appear to be classic "he said, he said" disputes. When two witnesses disagree, deciding which person to believe requires assessing credibility and weighing conflicting evidence. It is axiomatic that district courts

presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, "both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011). We have reversed district courts time and again for relying on one party's version of disputed facts to grant summary judgment. See, e.g., *Taylor v. City of Milford*, 10 F.4th 800, 804–05, 807 (7th Cir. 2021); *Gupta v. Melloh*, 19 F.4th 990, 996, 1002 (7th Cir. 2021); *McCottrell v. White*, 933 F.3d 651, 670–71 (7th Cir. 2019); *Miller v. Gonzalez*, 761 F.3d 822, 827–28, 830 (7th Cir. 2014); *Lewis v. Downey*, 581 F.3d 467, 476–78 (7th Cir. 2009); *Payne v. Pauley*, 337 F.3d 767, 773, 780–81 (7th Cir. 2003) (also laying to rest "the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion").

The law recognizes, however, a narrow exception to that rule in extreme cases, consistent with the narrow scope of summary judgment motions. "The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). A trial is necessary if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. The key words in that statement are "genuine" and "reasonably." It is not enough for the non-moving party to raise a "metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There "must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

The requirement that factual disputes be genuine to defeat summary judgment has heightened importance where a party relies exclusively on his own testimony to oppose summary judgment. In such a case, we cannot determine whether "genuine" factual issues exist without assessing whether a reasonable jury could rely on the party's sworn statements. See *James*, 959 F.3d at 315 (judges may "scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains"). If a party's sworn statements are "utterly implausible in light of all relevant circumstances," a court may reject them without a trial. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (affirming summary judgment denying bankruptcy discharge where debtor had defrauded creditors; despite debtor's sworn denial of fraudulent intent, no reasonable person could believe his stated reasons for his false representations and omissions).

Where that high standard is met, trial would serve no purpose because "no reasonable person" could resolve the material factual disputes in the non-movant's favor. *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (affirming summary judgment in copyright authorship dispute; plaintiff admitted defendant's joint authorship, and plaintiff's "blind affidavit" to the contrary that failed to explain inconsistencies with his prior statements did not present genuine issue of material fact); see also, e.g., *Reich v. City of Elizabethtown*, 945 F.3d 968, 980–81 (6th Cir. 2019) (affirming summary judgment when no reasonable fact-finder could credit plaintiff's allegation because her deposition testimony contradicted itself, medical evidence, and sworn assertions of defendant-officers and other eyewitnesses); *Chenari v. George Washington Univ.*, 847 F.3d 740, 747–48 (D.C. Cir. 2017) (recognizing "well-accepted

rule" that courts may disregard incredible testimony but holding that district court erred by setting aside plaintiff's testimony); *Pina v. Children's Place*, 740 F.3d 785, 798–99 & n.15 (1st Cir. 2014) (finding that no reasonable jury could credit plaintiff's allegation where it contradicted her amended complaint, deposition testimony, and other evidence); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (affirming summary judgment where district court "scrupulously detailed plain inconsistencies between the facts advanced by Rojas in opposition to summary judgment and those alleged in her original and amended complaints, in sworn interrogatory responses, in portions of her deposition testimony, in her complaints before the EEOC, and in prior sworn testimony").

The utter-implausibility exception to the general prohibition on resolving factual disputes at summary judgment is reserved for the "exceptional" and "extreme" case. *Chavin*, 150 F.3d at 728. There is no foolproof way to determine when a case qualifies as exceptional, but "sham-affidavit" cases and cases applying the utter-implausibility exception in the Seventh Circuit and elsewhere are a good place to start.[1] As we have cautioned in the sham-affidavit context, there is a difference between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Bank of Illinois*, 75 F.3d at 1169–70, quoting *Tippens*, 805 F.2d at 953; see also *Castro v. DeVry*

---

[1] The sham-affidavit rule authorizes a judge to disregard a "sham" affidavit—i.e., an affidavit that tries to create a factual issue capable of defeating summary judgment by contradicting the affiant's prior sworn statements, at least without explanation or justification. See *James*, 959 F.3d at 316–17.

*University, Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (sham affidavit principle must be applied with "great care;" "[f]ew honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification").

In the overwhelming majority of cases, variations and contradictions in a witness's statements over time and over the course of litigation create only "an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Illinois*, 75 F.3d at 1170, quoting *Tippens*, 805 F.2d at 954. But in rare cases, "a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact to be decided by a jury." *Rojas*, 660 F.3d at 106. This is one such case.

The only evidence supporting Whitaker's deliberate indifference claim against Officer Dempsey is his own testimony. We assess that testimony to determine whether a reasonable jury could credit his version of the disputed facts that could support a verdict in his favor. Our review leads us to the same conclusion the district court reached. Whitaker's account of the August 9th incident is "so flawed and so self-contradictory" that no reasonable jury could resolve in his favor the factual disputes about the sharp metal object and the five-minute gap. *Whitaker*, 2022 WL 20758240, at *5.

   1. *The Sharp Object*

The most significant problem with Whitaker's account of the August 9th incident is his inconsistent descriptions of the object that he purportedly used to injure himself. First, on August 9th, Whitaker told a prison nurse that he cut himself with his fingernail. Later that evening, he told hospital staff that he

used a pen. Next, in his grievances and pro se complaint, Whitaker identified an unspecified sharp metal object as the cutting instrument. Then, in his amended complaint, he referred to two pieces of sharp metal of different sizes and shapes, one used on August 9th and the other on August 16th. Finally, in his deposition, Whitaker testified that he used the same piece of sharp metal during both incidents, and he claimed for the first time that he found and hid the sharp metal object in a wall vent in his crisis cell.

We cannot see how any reasonable jury could reconcile these different statements. Nearly every time that Whitaker has recounted the events of August 9th, his description of the cutting instrument has changed. Taken alone, the sheer variety of Whitaker's descriptions of the cutting instrument poses a serious problem for his claim. Although Whitaker's pre-litigation statements are not binding, we find it striking that he could not offer a consistent description of the cutting instrument even in the hours immediately following the incident. The conflict between Whitaker's description of the cutting instrument in his amended complaint, filed with the help of counsel, and his sworn testimony is even more damaging. See *Moran v. Calumet City*, 54 F.4th 483, 494 (7th Cir. 2022) ("An allegation in a complaint is a judicial admission that can be used against the plaintiff."); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987) ("Affidavits and depositions entered in opposition to summary judgment that attempt to establish issues of fact cannot refute default admissions.").

Whitaker has not even acknowledged, let alone provided an explanation for, his inconsistent descriptions of the cutting instrument. As we have explained in the sham-affidavit

context, a factual dispute is much more likely to be a sham when "a witness has contradicted directly his or her own earlier statements without explaining adequately the contradiction or without attempting to resolve the disparity." *Bank of Illinois*, 75 F.3d at 1168. Whitaker has also never expressed uncertainty about the object that he used to injure himself, eliminating the possibility that he was confused or demonstrably mistaken when he made his earlier statements. Cf. *James*, 959 F.3d at 317 (an affidavit contradicting prior testimony is not considered a sham where initial testimony was ambiguous, confusing, or demonstrably mistaken). We cannot think of a plausible explanation for how a person could honestly mistake a cutting instrument for his own fingernail, a pen, two sharp objects of different sizes and shapes, and one sharp object discovered in a vent.

The unexplained and irreconcilable contradictions in Whitaker's descriptions of the cutting instrument show fabrication, not momentary confusion or ordinary lapses and vagaries of memory. Courts are not compelled to treat as true an assertion in a party's deposition or affidavit that is plainly false when considered alongside the rest of the record. See *Chavin*, 150 F.3d at 728 (affirming summary judgment despite debtor's sworn denial of fraudulent intent); *Jeffreys v. City of New York*, 426 F.3d 549, 552, 555 & n.2 (2d Cir. 2005) (disregarding plaintiff's testimony that police officers pushed him out the window in part because he failed to explain three pre-litigation confessions saying he had jumped out the window); *Seshadri*, 130 F.3d at 804 (disregarding plaintiff's testimony because it contradicted "numerous and unequivocal" pre-litigation admissions and his attempt to explain his prior inconsistent statements was both "incredible" and "incomplete"). "Otherwise, the very

purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985).

Focusing on only Whitaker's deposition testimony adds internal contradiction to the mix. In particular, Whitaker testified that before he was taken to the hospital, he hid the sharp object in a vent on the wall. Even by Whitaker's own account, we cannot identify any moment when he could have hidden the sharp object. According to Whitaker, he spent the entire August 9th incident sitting or lying on the floor—either because he was cooperating with orders given by correctional staff or because he was bleeding and unresponsive from blood loss. Between being handcuffed, pepper-sprayed, treated for his wound, taken to the eye–wash station, and then transferred to the hospital, there would have been no time when Whitaker could have moved to the cell wall and hidden a sharp object without being seen. The hall-facing walls of crisis cells have massive transparent windows to facilitate observation, and Whitaker was surrounded by medical and correctional staff for the majority of the incident. None of them reported seeing him move around except to flail his arms when nurses initially approached him.

Despite these unexplained contradictions in Whitaker's story, perhaps he might offer some corroborating evidence to support the version that he discovered and hid a sharp object in a vent in his cell? See *Hubbard v. Rewerts*, 98 F.4th 736, 749 (6th Cir. 2024) (when a witness changes his story multiple times, "a reasonable juror would likely need 'corroborating evidence' to discern which version of the witness's story is true" (quoting *Davis v. Bradshaw*, 900 F.3d 315, 330 (6th Cir.

2018))). But there is no physical evidence that Whitaker had access to a sharp object in his crisis cell. Prisoners housed in crisis cells are dressed in smocks and denied access to any sharp objects. While we assume mistakes can happen, correctional officers did not find any sharp object when they searched Whitaker's cell after he was taken to the hospital. Cf. *Jeffreys*, 426 F.3d at 552–53, 555 (absence of physical evidence supporting plaintiff's inconsistent testimony supported summary judgment).

Whitaker attempts to explain away the lack of evidence of a cutting instrument by suggesting that prison staff never conducted a search or that any search was "perfunctory and inadequate." But Whitaker lacks personal knowledge of whether prison officers conducted a thorough search of his cell, and he has not presented any evidence contradicting the sworn statement of Officer Dempsey, who does have such knowledge. Whitaker is entitled to all reasonable inferences in his favor, but mere speculation or conjecture cannot defeat summary judgment. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021).

Further, if Whitaker showed Dempsey a sharp object before he began to cut himself, common sense dictates that some evidence of that object would be in the record—if only because a prisoner with a sharp object and an apparent willingness to use it creates an obvious and serious security risk. Whitaker testified that Dempsey had a clear view of the sharp object in his hand. If so, it is highly unlikely that Dempsey would have omitted that detail when relaying the situation to Boel. Prison officers consider sharp metal objects to be "exceptionally dangerous contraband." The presence of a sharp object in Whitaker's cell would have endangered all the

correctional and medical staff who needed to be in close quarters with Whitaker to secure his arms and attend to his wound. That is especially true in light of Whitaker's known history of failing to comply with orders and attacking guards.

2. *The Five-Minute Gap*

The impossibility of reconciling Whitaker's statements before and during the litigation about the metal object also sinks his testimony that Dempsey waited five minutes after seeing him cut his arm before calling Boel. Standing alone, Whitaker's testimony about the delay is vague. He has not explained what Dempsey was doing during the alleged five-minute gap; presumably, Dempsey was just standing in front of Whitaker's cell silently the entire time. As the district court explained, it seems "odd, though not inconceivable, that a guard would just stand there, hovering, doing nothing." *Whitaker*, 2022 WL 20758240, at \*5; cf. *Jeffreys*, 426 F.3d at 552, 555 (district court properly granted summary judgment where, among other inconsistencies, plaintiff could not identify or describe officers who allegedly attacked him).

In addition, Whitaker's testimony has vacillated between his original allegation in his pro se complaint that Dempsey called for help immediately after he observed Whitaker bleeding and his later allegation in his amended complaint that Dempsey waited five minutes after seeing Whitaker injure himself before calling Boel. Although his pro se complaint has since been superseded, its allegations are still evidentiary admissions that Dempsey could offer at trial to attack Whitaker's credibility. See *Davis v. Freels*, 583 F.2d 337, 342 (7th Cir. 1978); accord, *Seshadri*, 130 F.3d at 801. The fact that Whitaker testified to both versions of the story within five minutes in his deposition weighs sharply against his credibility. Like the

district court, however, we think these observations alone would not support summary judgment, particularly in light of Whitaker's speech impediment and the ambiguity of his testimony on this point.

The more serious problem is that we cannot disentangle the question whether Whitaker had a metal object from whether Dempsey waited five minutes after seeing Whitaker injure himself before calling his supervisor. It is possible to imagine a scenario with a five-minute delay but no sharp object, but no evidence in the record supports that scenario. Whitaker testified that Dempsey watched him cut himself with the sharp metal object for five minutes before calling Boel. Because no reasonable jury could credit Whitaker's testimony that he waved a sharp metal object or cut himself with a sharp metal object, neither could it conclude that Dempsey waited five minutes after seeing Whitaker cut himself with that sharp metal object to call Boel. Mere speculation about a hypothetical scenario to which Whitaker did not testify cannot defeat summary judgment. See *FKFJ*, 11 F.4th at 585.

In short, the factual disputes about the sharp object and the five-minute gap are material but not genuine. A jury, considering the record as a whole, could conclude only that Whitaker's testimony about the sharp object and the five-minute gap was fabricated. Without those allegations, a jury could not find that Dempsey was deliberately indifferent to the risk that Whitaker would harm himself. By Dempsey's account, he called Boel as soon as he observed Whitaker lying on the ground injured. His prompt call to Boel, pursuant to prison policy, negates Whitaker's assertion that "he acted with the reckless or malicious intent required to sustain a deliberate-indifference claim." *Earl v. Racine County Jail*, 718 F.3d 689, 692

(7th Cir. 2013) (no deliberate indifference where officer promptly called nurse after being informed that plaintiff was having an allergic reaction); see *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference."). We therefore affirm the district court's grant of summary judgment to Officer Dempsey.

We emphasize once more that this is an exceptional case, not an invitation for defendants to move for summary judgment or for district courts to grant summary judgment based on ordinary conflicts, ambiguities, and inconsistencies in a plaintiff's testimony. Like the sham-affidavit rule, the utter-implausibility exception to the ordinary prohibition on making credibility decisions at summary judgment "ought to be applied with great caution." *Bank of Illinois*, 75 F.3d at 1169. Common failures of memory or mundane instances of confusion or ambiguity will not justify summary judgment. *Id*. at 1169–70.

B.  *Wanton and Unnecessary Force Claim Against Boel*

Whitaker also argues that the single burst of pepper spray that Lieutenant Boel delivered to his face constituted wanton and unnecessary force in violation of the Eighth Amendment. Both sides agree that Whitaker's wrists were in handcuffs at the time of the pepper spray, but they dispute whether Whitaker was cooperative or combative. Whitaker testified that he complied with all orders and cooperated with nurses' efforts to dress his wound. Boel's affidavit asserts that when medical staff entered the cell, Whitaker became combative and refused treatment. It further asserts that Whitaker waved his arms, preventing the nurses from dressing his wound and causing

blood to splash on other people in the cell. Whitaker admits that blood splashed on Boel and other officers. He maintains that he did not deliberately spray blood, fling his arms, or prevent nurses from treating his wound.

The district court was also right to grant summary judgment to Boel on this claim. The Eighth Amendment protects prisoners from physical force that amounts to the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986), quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977). "What matters—and what will generally be the decisive factor in cases such as this—is the mindset of the individual applying the force." *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009). A prison officer's use of force is unnecessary and wanton if he intends "maliciously and sadistically" to cause harm to a prisoner. *Forrest v. Prine*, 620 F.3d 739, 744 (7th Cir. 2010), quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Force used in "a good-faith effort to maintain or restore discipline" does not violate the Eighth Amendment. *Id.* (internal quotation marks omitted), quoting *Hudson*, 503 U.S. at 7.

As in many cases, the record lacks any direct evidence that Boel sprayed Whitaker with malicious intent. In lieu of direct evidence, we consider whether circumstantial evidence could support a reasonable inference of malicious intent. See *Smith v. Kind*, 140 F.4th 359, 366 (7th Cir. 2025) (courts assess circumstantial evidence of intent in Eighth Amendment cases alleging wanton and unnecessary force because "direct evidence of intent rarely exists"); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (affirming dismissal where officer used mace only after plaintiff had hit another inmate). We consider several factors, including "(1) the need for the application of force; (2) the relationship between the need and the amount of force

that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019), citing *Whitley*, 475 U.S. at 321.

On this record, no reasonable jury could find that Boel maliciously and sadistically inflicted pain on Whitaker. It is unlikely that a reasonable jury could credit Whitaker's testimony that he was docile and compliant at the time of the pepper spray burst. Shortly before being pepper-sprayed, Whitaker had failed to comply with multiple direct orders, at least one of which Boel had delivered personally. Whitaker admitted that his blood splashed on multiple staff members, including Boel. He has not offered any explanation for how his blood splashed on staff members if he was lying on the ground and complying with orders given by medical and correctional staff. It's also undisputed that after the pepper spray burst, no more blood was spilled on the officers, and nurses were able to attend to the wound on Whitaker's right arm. Those undisputed facts strongly suggest that Whitaker's conduct changed after the spray, consistent with Boel's sworn assertions.

Boel's description of Whitaker when the nurses arrived is also corroborated by Dixon's internal investigation, Whitaker's "Offender Health Status Transfer Summary," and Whitaker's disciplinary card, all of which characterized Whitaker as uncooperative during the August 9th incident. Dixon's internal investigation report included the statements of three officers who were present at the time of the pepper spray burst. They all reported that Whitaker flailed his arms in close

proximity to correctional and medical officers. Whitaker him-
self said in his interview for the incident investigation that
Boel pepper-sprayed him because Boel claimed that he was
attempting to fling blood on staff.

The undisputed facts and record evidence thus strongly
support Boel's story that Whitaker flailed his arms in close
enough proximity to prison officers to get blood on them and
to prevent nurses from treating his wound. However, we are
wary of relying on the utter-implausibility exception to re-
solve Whitaker's claim against Boel. Given the strength of
Boel's evidence relative to Whitaker's, there may be a tempta-
tion to extend the deference owed to correctional officers un-
der substantive Eighth Amendment law to defer improperly
to the officers' testimony when deciding a summary judg-
ment motion. See *McCottrell*, 933 F.3d at 671 ("deference to
prison officials" does not justify disregarding factual dis-
putes; vacating grant of summary judgment to correctional
officers alleged to have used wanton and unnecessary force
against prisoners); *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th
Cir. 2014) (vacating grant of summary judgment to police of-
ficer alleged to have used excessive force: "Sometimes the
heftiness of the evidence on one side, or the credulity of a par-
ticular litigant makes our task of suspending factual and cred-
ibility determinations difficult, but whatever the difficulty, we
must stick to the task on summary judgment."). In the end,
though, we need not rely on the internal contradictions in
Whitaker's testimony to resolve his claim against Boel. Even
if we assume, as Whitaker claimed in response to defendants'
motion for summary judgment, that Whitaker himself *in-
tended* to comply with officers' orders, he has presented insuf-
ficient evidence that Boel acted with a malicious and sadistic
state of mind.

Whether Whitaker was unable or unwilling to cooperate with nurses' efforts to address his injury, it remains undisputed that he was splattering blood on Boel and other staff members. So even if we assumed his intent was benign, that would not change the significance of that key fact. Assuming that he was unable to cooperate—and no evidence suggests he was—Whitaker has not provided any evidence that Boel could or should have appreciated that he was "unable, as opposed to unwilling, to comply." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 668 (7th Cir. 2012), abrogated on other grounds by *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Faced with a bleeding prisoner who had a long history of noncompliance and aggression toward staff, Boel reasonably perceived a threat to the safety of both prison officers and Whitaker himself. Boel had sound reasons to act quickly to protect himself and other staff members from bloodborne diseases and to restore order so that Whitaker could be treated.

Having reasonably perceived a need for force, Boel's single, short burst of pepper spray was also proportional to the gravity of the threat. See *Smith*, 140 F.4th at 368 (proportionality between need for force and amount of force used is relevant in wanton and unnecessary force inquiry). In general, many prisoners "may experience pepper spray as a relatively minor use of force." *Id.* at 369. In this situation, pepper spray was less intrusive than, and likely preferable to, a physical struggle to control Whitaker's bleeding. See *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) ("pepper spray is generally of limited intrusiveness" and "a very reasonable alternative to escalating a physical struggle with an arrestee" (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002))). A physical struggle could have worsened Whitaker's injury and increased the risk of bloodborne illnesses or other

injuries to staff members. In addition, Boel stopped using pepper spray as soon as Whitaker no longer posed a threat to himself or prison staff members. Cf. *McCottrell*, 933 F.3d at 667 (jury could find wanton and unnecessary force where, according to plaintiffs' account, the need for force had passed before prison guards fired warning shots that injured plaintiffs).

Finally, the extent of the injury caused to Whitaker and the effort made to temper the severity of the force weigh against an inference that Boel acted maliciously. Pepper spray is painful, but Whitaker was taken to an eye-wash station as soon as possible, and he suffered only mild irritation in the meantime. Whitaker has not put forth evidence that he suffered any long-term pain or injuries from the pepper spray. Whitaker's minimal injuries and the steps taken to ameliorate those injuries do not support a reasonable inference that Boel acted wantonly.[2]

---

[2] Our analysis does not rely on Boel's disputed assertion that he gave Whitaker an oral warning before spraying him. Whitaker denies that he received an oral warning. Both the incident report and the interview that Whitaker gave for the incident investigation corroborate Boel's affidavit, but the evidence is not so overwhelming as to justify resolving this disputed fact without a jury. We have cautioned that the use of chemical agents should generally follow "adequate warning[s]." *Lewis v. Downey*, 581 F.3d 467, 479 (7th Cir. 2009), quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). However, oral warnings are not constitutionally required in all circumstances. *Id.* at 478 ("In a jail or prison setting, it is not hard to imagine any number of scenarios that would justify the immediate and unadvertised use of summary force …."). Given the undisputed evidence that Whitaker was splattering blood on staff members despite their efforts to control and treat him, Boel's single burst of pepper spray did not amount to wanton and unnecessary force on this record regardless of whether an oral warning was given.

On these undisputed facts, Boel's use of force was a "reasonable response to the institution's legitimate security concern" about Whitaker's failure to comply and disease transmission. *Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir. 1984) (no wanton and unnecessary force where "chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern"). It was also "reasonably necessary," *id.* at 1270, to prevent Whitaker from worsening his injury and suffering further blood loss. We affirm the district court's grant of summary judgment to Lieutenant Boel.

C.  *Deliberate Indifference Claim Against Castenado*

Finally, we affirm the district court's grant of summary judgment to Officer Castenado because the August 16th incident did not result in Whitaker suffering a cognizable injury. A genuine risk of suicide or self-harm is an objectively serious medical condition, so the failure to respond to and mitigate a meaningful risk of either may amount to deliberate indifference. But to "succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages.'" *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (emphasis omitted), quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011). The kind and degree of harm necessary to recover under § 1983 depend on the constitutional claim at issue. See *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997). We take each case "on its own facts." *Id.* Although a plaintiff's injury need not be significant, it "must be more than trifling." *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988) ("*de minimis non curat lex* applies to constitutional torts as well

as common law torts"), citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

In *Lord v. Beahm*, we applied those principles to a prisoner's claim that prison officers were deliberately indifferent to the risk that he would commit suicide. There, the prisoner displayed a razor blade and threatened to commit suicide. 952 F.3d 902, 903–04 (7th Cir. 2020). We held that the deliberate indifference claim failed because the prisoner did not suffer an injury compensable under section 1983. *Id.* at 905. The prisoner's wounds were limited to a few minor scratches on his forearm, which were "quickly and easily treated with a gauze bandage." *Id.* He did not provide any evidence that he suffered another form of injury like psychological harm. Because the plaintiff's injuries were, by any measure, "trivial—indeed, almost nonexistent," he did not present a triable issue about whether he experienced a cognizable harm. *Id.*

Like the plaintiff in *Lord*, Whitaker has provided evidence of only trivial physical injuries unaccompanied by any other kind of harm. His physical injuries from the August 16th incident consisted of at most a few mild scratches that were treated with a gauze bandage. Without more, those scratches do not amount to a cognizable injury. Evidence of psychological harm can also support the damages element of § 1983, but Whitaker has not provided any evidence that he experienced short-term or enduring psychological harm from the incident. We need not decide whether a jury could find that Castenado's conduct rose to the level of deliberate indifference. See *Gabb*, 945 F.3d at 1033.

Correctional officers must stay vigilant about the real threat that self-harm and suicide pose to those incarcerated in our nation's jails and prisons. See *Lord*, 952 F.3d at 905 (noting

that suicide in prison was on the rise). In this case, the correctional officers who reported to Whitaker's crisis cell on August 9th complied with their constitutional obligations, and Whitaker's threat to injure himself on August 16th produced at worst a superficial wound that required little medical attention. But the danger to the next prisoner may be much greater and even fatal. Correctional officials have a constitutional duty to respond reasonably to such dangers as they arise and become known.

AFFIRMED.